UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:13-cr-00133-JAW-02 |
| | ) | |
| ALAN KETCHEN | ) | |

**ORDER ON MOTION TO WITHDRAW GUILTY PLEA**

Alan Ketchen asserts that under Federal Rule of Criminal Procedure 11(d)(2)(B), he has demonstrated a "fair and just reason for requesting the withdrawal" of his May 7, 2014 guilty plea to two counts of a five-count indictment because, pursuant to the recent United States Supreme Court ruling of *McFadden v. United States*, 135 S. Ct. 2298 (2015), he claims this Court failed to explain the mens rea requirements of the crimes charged against him at his Rule 11 proceeding, and the Government could not prove beyond a reasonable doubt that he knew he was possessing and distributing a controlled substance analogue. The Court denies Mr. Ketchen's motion because he pleaded guilty to Controlled Substances Act crimes unaffected by *McFadden* and because the Court concludes that he knowingly and voluntarily pleaded guilty to the Analogue Act portion of the charges.

## I.    PROCEDURAL BACKGROUND

On July 17, 2013, a federal grand jury returned a five-count indictment against Mr. Ketchen and thirteen other conspiracy members for the distribution of a controlled substance and related firearm offenses. *Indictment* (ECF No. 1) (*Indictment*). Mr. Ketchen was charged in Counts One and Three. *Id.* at 2-5. Count

One alleged that Mr. Ketchen knowingly and intentionally conspired to distribute and possess with intent to distribute 3,4-Methylenedioxypyrovalerone (MDPV), classified as a controlled substance analogue prior to October 21, 2011, and classified as a schedule I controlled substance as of October 21, 2011, all in violation of 21 U.S.C. §§ 813, 841(a)(1). *Id.* at 2-3. Count Three alleged that Mr. Ketchen knowingly leased, rented, used and maintained, permanently or temporarily, a residence in Bangor, Maine for the purpose of unlawfully distributing and using MDPV, classified as a controlled substance analogue prior to October 21, 2011, and classified a schedule I controlled substance as of October 21, 2011. *Id.* at 4-5.

On August 6, 2013, Mr. Ketchen was arrested, (ECF No. 75), and made his initial appearance, entering a plea of not guilty to the charges. (ECF No. 93). On May 7, 2014, Mr. Ketchen pleaded guilty to the indictment. *Entry* (ECF No. 374). After Mr. Ketchen and two of his co-defendants raised a question in their sentencing memoranda as to how MDPV should be treated for sentencing purposes, on June 11, 2015, the Court ruled against Mr. Ketchen and two of his co-defendants and concluded that MDPV should be considered a controlled substance analogue to methcathinone, a schedule I controlled substance. *Order on Treatment of 3,4 Methylenedioxypyrovalerone Under United States Sentencing Guidelines and Req. for Joint Presentence Conference* (ECF No. 706).

On June 30, 2015, Mr. Ketchen moved under Federal Rule of Criminal Procedure 11(d)(2)(B) to withdraw his guilty plea to Counts One and Three. *Mot. to Withdraw Guilty Plea* (ECF No. 708) (*Def.'s Mot.*). On August 31, 2015, Mr. Ketchen

2

filed a memorandum in support of his motion to withdraw his guilty plea.  *Def. Alan Ketchen's Mem. in Supp. of his Mot. to Withdraw Guilty Plea* (ECF No. 722) (*Def.'s Mem.*).  The Government objected to Mr. Ketchen's motion on September 28, 2015.  *Gov't's Obj. to Def.'s Mot. to Withdraw Guilty Plea* (ECF No. 725) (*Gov't's Opp'n*).  Mr. Ketchen responded to the Government's objection on October 13, 2015.  *Def.'s Resp. to Gov't's Obj. to Mot. to Withdraw a Guilty Plea* (ECF No. 726) (*Def.'s Reply*).

## II.   THE PARTIES' POSITIONS

### A.    Mr. Ketchen's Motion to Withdraw Guilty Plea

On June 18, 2015, the United States Supreme Court decided *McFadden v. United States*, 135 S. Ct. 2298 (2015), holding that section 841(a)(1) of the Controlled Substances Act (CSA), 21 U.S.C. §§ 801-971, "requires the Government to establish that the defendant knew he was dealing with 'a controlled substance,'" and specifically that:

> [w]hen the substance is an analogue, that knowledge requirement is met if the defendant knew that the substance was controlled under the CSA or the [Controlled Substance Analogue Enforcement Act of 1986 (the Analogue Act)], even if he did not know its identity.  The knowledge requirement is also met if the defendant knew the specific features of the substance that make it a 'controlled substance analogue.'

*Id.* at 2302 (citing 21 U.S.C. § 802(32)(A)).  Mr. Ketchen asserts, pursuant to *McFadden*, that he should be permitted to withdraw his guilty plea, as: (1) "the scienter requirement was not explained to [Mr. Ketchen] in the [Rule 11 proceeding]"; (2) "the scienter requirement was not part of the government's version of the offense"; (3) "that a defense exists regarding an element of the offense which was not anticipated, nor explained in his plea"; and (4) that *McFadden* "highlights facts, laws

3

and circumstances not known to the defendant nor explained to the defendant regarding his [Rule 11 proceeding]." *Id.* at 3. Mr. Ketchen concludes that because of *McFadden* there is "a basis for a 'fair and reasonable reason to request withdrawal of his guilty plea,'" and specifically that the Government failed to provide evidence in the indictment "that the defendant knew MDPV was [an] 'analogue' drug prior to October 21, 2011 and that the defendant knew MDPV was a controlled substance after October 21, 2011." *Id.* at 3-4 (citing F. R. CRIM. P. 11(d)(2)(B)).

### B.     Mr. Ketchen's Memorandum in Support of his Motion to Withdraw Guilty Plea

Mr. Ketchen acknowledges that the burden of persuasion rests upon the defendant for a withdrawal of guilty plea, and lists the relevant factors to consider in whether to grant a withdrawal of guilty plea as including "whether the plea was voluntary, intelligent and knowing and complied with Rule 11; the force of the reasons offered by the defendant; whether there is a serious claim of actual innocence; the timing of the motion; and any countervailing prejudice to the government if the defendant is allowed to withdraw his plea." *Def.'s Mem.* at 2 (citing *United States v. Castro-Gomez*, 233 F.3d 684, 687 (1st Cir. 2000)).

Mr. Ketchen says that knowledge that a substance is controlled under "the Analogue Act is a necessary element of Count 1 and Count 3 of the indictment," and that the indictment "did not indicate that [he] knew that the substance was a controlled substance analogue prior to October 21, 2011." *Id.* at 3-4. Moreover, he argues that the mere knowledge of the "identity of the substance" is not sufficient to satisfy the requisite mens rea and that in addition he needed to know the substance

was controlled. *Id.* at 5. Mr. Ketchen asserts that the record from his Rule 11 proceeding illustrates that his plea was not "voluntary, intelligent or knowing," as the Government "failed to distinguish the two sets of applicable laws and the 'knowingly' requirement of possession and distribution under the Analogue Act" and "[did] not indicate that the [he] <u>knew</u> that MDPV was a controlled substance analogue during acts of possession and distribution prior to October 21, 2011." *Id.* at 6 (emphasis in original).

Regarding the other factors to be weighed when considering a withdrawal of a guilty plea, Mr. Ketchen says that the amount of time between a guilty plea and the request to withdraw the plea is a "relevant temporal gap" measured from the date of "discovery of new information occurs" to the withdrawal of guilty plea. *Id.* at 7 (quoting *United States v. Gonzalez*, 202 F.3d 20, 24 (1st Cir. 2000)). Mr. Ketchen notes that he filed his motion only days after the issuance of *McFadden*. *Id.* He also asserts that there is evidence of his innocence "regarding this very narrow issue," noting that in his statement of acceptance of responsibility he maintained that he "was told that they were synthetic research chemicals that were legal . . . that you could get it at the head shop and at truck stops. That you could get it off the internet." *Id.* Finally, Mr. Ketchen says that he "does not believe that there is any substantial prejudice to the government in this case." *Id.* at 8.

## C.    The Government's Objection to Mr. Ketchen's Motion

Addressing the "voluntarily, knowingly, intelligently" analysis for a withdrawal of guilty plea, the Government asserts that Rule 11 "has a predominantly

prophylactic purpose," and that the "main thrust of the rule is to ensure that a defendant who pleads guilty does so with full comprehension of the specific attributes of the charge and the possible consequences of the plea." *Gov't's Opp'n* at 10 (citing *United States v. McDonald*, 121 F.3d 7, 11 (1st Cir. 1997)). The Government argues that the transcript of Mr. Ketchen's Rule 11 proceeding reflects that he was advised of "the charges, the penalties that could be imposed, and the rights he was giving up by pleading guilty," that Mr. Ketchen does not "seriously dispute this," and that he only makes "a nuanced argument concerning his understanding of the mens rea element of the offenses" and at no point argues that the plea was involuntary. *Id.* at 10 n.2.

Next, the Government identifies two reasons put forth by Mr. Ketchen to withdraw his guilty plea: (1) that the Government "cannot prove beyond a reasonable doubt *that prior to October 21, 2011* he knew he was possessing or distributing a substance regulated under the Analogue Act," and (2) that the Court "did not explain the mens rea element of the two offences," and particularly the "mens rea element in offenses involving controlled substance analogues like MDPV as recently explained in *McFadden*." *Id.* at 10 (emphasis in original). The Government contends that the strength of the reasons offered for the withdrawal of guilty plea is "lacking." *Id.*

First, the Government argues that the Court adequately advised Mr. Ketchen of the mens rea element under Rule 11. *Id.* Citing *United States v. Jones*, 778 F.3d 375, 382 (1st Cir. 2015), the Government asserts that a guilty plea under Rule 11 does not require "a fixed catechism" or a set of "magic words," but only that a district

court touch all of the "appropriate bases" and its colloquy be assessed "in light of 'the attributes of the particular defendant, the nature of the specific offense, and the complexity of the attendant circumstances.'" *Gov't's Opp'n* at 10-11 (quoting *Jones*, 778 F.3d at 382). As such, the Government asserts that *McFadden* does not create a new mens rea requirement for controlled substance analogue offenses, but rather "confirmed pre-existing case law establishing a *mens rea* requirement in controlled substance offenses, confirmed that requirement must be met by the Government in cases involving substances that were controlled either by operation of the drug schedules or by operation of the Analogue Act, and explained how the Government could circumstantially prove the *mens rea* requirement in an analogue case." *Id.* at 11. The Government submits that the Court's summary of the charges were sufficient under this rubric, as the Court advised Mr. Ketchen that he was charged "with *knowingly and intentionally* conspiring to distribute a *controlled substance*," and the Court was not required to explain "the intricacies regarding how MDPV was controlled at different times." *Id.* at 11-12 (emphasis in original).

Second, the Government asserts that the law is clear that a crime may be charged in the conjunctive. *Id.* at 12-13 (citing *United States v. Garcia-Torres*, 341 F.3d 61, 66 (1st Cir. 2003)). The Government explains that the concept of "conjunctive" stands for "where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means." *Id.* at 13 (quoting *Garcia-Torres*, 341 F.3d at 66-67)). Thus, the Government contends that because Count One charges Mr. Ketchen "with conspiring to distribute

and possess with the intent to distribute the controlled (analogue) substance MDPV and the controlled (Schedule I) substance MDPV . . . Guilt of his commission of this offense – by plea or by trial – could be established by proving his knowing participation in the conspiracy involved one or the other." *Id.* at 14 (citing *Garcia-Torres*, 341 F.3d at 66-67). Similarly, for Count Three, "[g]uilt of his commission of this offense (by plea or by trial) could be established by proof he knowingly leased, rented, used or maintained the residence for distributing or using the analogue controlled substance MDPV or the Schedule I controlled substance MDPV." *Id.* The Government concludes that Mr. Ketchen's guilty pleas are not affected by the *McFadden* decision, as:

> [e]ven assuming arguendo that . . . the Government could not prove his guilt as to conduct that occurred prior to October 21, 2011, that would not earn him an acquittal at trial or warrant a withdrawal of his guilty plea. He does not contend that he misunderstood the *mens rea* element as it relates to offenses involving a Schedule I drug like MDPV.

*Id.* at 14-15.

Regarding the timing of the motion, the Government highlights that Mr. Ketchen was indicted on July 17, 2013, pleaded guilty to Counts One and Three on May 7, 2014, and on July 30, 2015 – fourteen months after he pleaded guilty – moved to withdraw his guilty plea. *Id.* at 15. Noting this lapse in time, the Government argues that the longer a request is delayed, the more potency the motion must have in order to gain favorable consideration and the more the Court should disfavor the motion. *Id.* at 15 (citing *United States v. González-Vázquez*, 34 F.3d 19, 23 (1st Cir. 1994)). The Government argues that *McFadden* did not create a new element of an

offense, and when considering the lack of force to Mr. Ketchen's assertion of innocence, the fourteen-month delay in making his motion to withdraw guilty plea undermines his request. *Id.* at 16.

The Government points out that Mr. Ketchen is only claiming his innocence of part of the crimes charged in Counts One and Three of the indictment, and that the totality of the circumstances demonstrate that there is little force to his assertion of innocence. *Id.* at 16. The Government notes that Mr. Ketchen admitted to the prosecution version of the offense at his Rule 11 proceeding, and thus agreed that he knowingly and intentionally participated in a conspiracy to distribute MDPV, satisfying the requirements of *McFadden*. *Id.* at 16-17. Additionally, the Government says that the PSR reveals "overwhelming" evidence of Mr. Ketchen's participation in the drug conspiracy. *Id.* at 17-18. The Government provides other examples that the Court should consider when assessing Mr. Ketchen's assertion of innocence, including: (1) "seventeen of [Mr. Ketchen's] co-conspirators have admitted to conspiring with [Mr. Ketchen]" and none of them has "sought to withdraw or vacate their guilty pleas"; (2) "[n]umerous cooperating defendants and witnesses testified before the grand jury, thousands of pages of business records were collected, and law enforcement seized MDPV from [Mr. Ketchen] and his co-conspirators"; and (3) "[t]he Court listened to every co-conspirator's allocution and read their statements accepting responsibility," giving the Court "special insight into this case" which it should draw on "when considering the force of [Mr. Ketchen's] claim that he is innocent." *Id.* at 18-19.

Finally, the Government contends that Mr. Ketchen has failed to prove that the Government would suffer no prejudice if his motion to withdraw guilty plea was granted. *Id.* at 19. The Government highlights that the investigation into Mr. Ketchen's conduct began over four years ago, he was indicted over two years ago, and that "[w]ith the passage of time memories fade and witnesses relocate" and "[p]roving a case beyond a reasonable doubt" after this lapse in time would be difficult. *Id.* Additionally, the Government also observes that since his guilty plea all of his co-conspirators have been sentenced and it may prove difficult to obtain their testimony. *Id.* at 19-20.

### D.   Mr. Ketchen's Response to the Government's Objection

Mr. Ketchen responds by arguing that "[n]either the indictment nor the Rule 11 Proceeding included the necessary scienter element of MDPV being a controlled substance analogue," and because of this his plea "could not have been made voluntarily, intelligently, or knowingly" and that he can show evidence of actual innocence under the Analogue Act." *Def.'s Reply* at 2.

Mr. Ketchen renews his argument that the "indictment left out the necessary *mens rea* element that he *knew* he was possessing and or distributing *a substance in violation of the Analogue Act*," and specifically that the "indictment never specified that [he] knew that the substance was a controlled substance analogue prior to October 21, 2011" and was thus insufficient under *McFadden*. *Id.* at 3 (emphasis in original). Regarding the Rule 11 proceeding, he argues that the Court "surely did not touch on all the 'appropriate bases' when it left out the scienter element of the

offense," which is grounds for withdrawal of his plea of guilty, as "[d]ue process requires that a defendant be apprised of the nature of the charges, including the element of intent." *Id.* at 5 (quoting *United States v. Bigman*, 906 F.2d 392, 394 (9th Cir. 1990)).  Mr. Ketchen asserts that though "[t]he Court *did* advise [him] that he was charged with knowingly and intentionally conspiring with others and that he knowingly used a property to do this . . . the Court omitted if [he] knew that MDPV was a controlled substance analogue during the acts of possession and distribution prior to October 11, 2011." *Id.* at 6 (emphasis in original).

Mr. Ketchen concludes his reply brief by renewing his arguments regarding the timing of the motion, evidence of actual innocence, and prejudice to the Government. *Id.* at 7.

## III.   FACTUAL, STATUTORY, AND CASELAW BACKGROUND

### A.   The Indictment

On July 17, 2013, the grand jury charged Mr. Ketchen with violating federal drug trafficking laws; Count One of the indictment reads:

> Beginning on a date unknown, but no later than April 1, 2011 and continuing until a date unknown, but no earlier than December 31, 2011, in the District of Maine and elsewhere, defendants . . . knowingly and intentionally conspired with one another and with persons known and unknown to commit offenses against the United States, namely distribution and possession with intent to distribute: (1) prior to October 21, 2011, a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802(32), with intent for human consumption as provided in Title 21, United States Code, Section 813; and (2) from October 21, 2011 until a date unknown, but no earlier than December 31, 2011, a mixture or substance containing a detectable amount of MDPV, a Schedule I controlled substance (by Final Order of DEA, 76

11

Fed. Reg. 65371), all in violation of Title 21, United States Code, Section 846, 841(a)(1), and 813.

*Indictment* at 3.  Count Three states:

> Beginning on a date unknown, but not later than April 1, 2011, and continuing until December 31, 2011, in the District of Maine, defendant[] . . . **ALAN J. KETCHEN, a/k/a "AJ", "Hobbes"** . . . knowingly leased, rented, used and maintained, permanently or temporarily, a residence located at 10 Blackstone Street in Bangor, Maine, for the purpose of unlawfully distributing and using (1) prior to October 21, 2011, a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802(32), with intent for human consumption as provided in Title 21, United States Code, Section 813; and (2) from October 21, 2011 until a date unknown, but no earlier than December 31, 2011, a mixture or substance containing a detectable amount of MDPV, a Schedule I controlled substance (by Final Order of DEA, 76 Fed. Reg. 65371), and did aid and abet such conduct, in violation of Title 21, United States Code, Sections 856(a)(1) and 813 and Title 18, United States Code, Section 2.

*Id.* at 4-5 (bold in original).

## B.    The Rule 11 Proceeding

On May 7, 2014, Mr. Ketchen pleaded guilty to Counts One and Three of the Indictment.  *See Minute Entry* (ECF No. 374); *Transcript of Rule 11 Proceeding* (ECF No. 710) (*Tr.*).  During the proceeding the Court found Mr. Ketchen to be competent, *Tr.* 4:6-6:15, allowed him to tender a plea of guilty, *id.* 7:6-7:20, and confirmed that he was pleading guilty to the charges because he was "actually guilty of each of those crimes and for no other reason." *Id.* 8:1-4.  His counsel expressed satisfaction that Mr. Ketchen was pleading guilty because he was actually guilty.  *Id.* 8:6-9.  Additionally, Mr. Ketchen confirmed that he had received a copy of the indictment, that he had enough time to discuss the charges with his attorney, and that his attorney had

explained the elements and the nature of the offenses charged, and the penalties that could be imposed. *Id.* 8:10-22. Mr. Ketchen's counsel expressed that he was satisfied that the Defendant understood the charges and the penalties that could be imposed, *id.* 8:22-25, and the Court reviewed the charges and confirmed that the Mr. Ketchen understood them:

> THE COURT: Count 1 alleges that beginning on a date unknown, but no later than April 1, 2011, and continuing until a date unknown, but no earlier than December 31, 2011, in the District of Maine, which means the state of Maine, you and a number of other individuals knowingly and intentionally conspired with one another to commit an offense against the United States, namely, the distribution of MDPV, a controlled substance. Do you understand the charge set forth in Count 1 of the indictment?

> MR. KETCHEN: Yes.

> THE COURT: Now, Count 3 of the indictment alleges that beginning on a date unknown, but no later than April 1, 2011, and continuing until December 31, 2011, in the District of Maine, which, again, means the state of Maine, you knowingly leased, rented, used, and maintained, permanently or temporarily, a residence located at 10 Blackstone Street, Bangor, Maine, for the purpose of unlawfully distributing and using the premises to distribute MDPV, again, a controlled substance, in violation of federal criminal law. Do you understand the charge set forth in Count 3 of the indictment?

> MR. KETCHEN: Yes.

*Id.* 9:1-25. The Court reviewed the potential penalties for the offenses, *id.* 10:1-12:5, and the rights the Defendant was giving up. *Id.* 12:6-14:13.

Next, the Court confirmed the accuracy of the prosecution version of the offenses and that there was a factual basis for Mr. Ketchen's guilty plea. *Id.* 14:14-15:9. The prosecution version provided in part:

Between approximately April 1, 2011 and December 31, 2011, in Penobscot County, Maine and elsewhere, there existed a conspiracy to possess with intent to distribute and distribute (1) prior to October 21, 2011, a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802 (32), with intent for human consumption as provided in Title 21, United States Code, Section 813; and (2) from October 21, 2011 until a date unknown, but no earlier than December 31, 2011, a mixture or substance containing a detectable amount of MDPV, a Schedule I controlled substance. During its existence, the defendant knowingly and intentionally joined and participated in the conspiracy.

During the same period of time, the defendant also knowingly leased, rented, used and maintained, permanently or temporarily, a residence located at XX Blackstone Street in Bangor, Maine ("the Blackstone Residence"), for the purpose of unlawfully distributing and using (1) prior to October 21, 2011, a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802 (32), with intent for human consumption as provided in Title 21, United States Code, Section 813; and (2) from October 21, 2011 until a date unknown, but no earlier than December 31, 2011, a mixture or substance containing a detectable amount of MDPV, a Schedule I controlled substance (by Final Order of DEA, 76 Fed. Reg. 65371.

During his involvement in the conspiracy, the defendant regularly associated with other members of the conspiracy at the Blackstone Residence and elsewhere, including co-defendant Ryan Ellis, for the purpose of distributing and facilitating the distribution of MDPV and using the same. The defendant packaged MDPV at the Blackstone Residence and distributed it to other members of the conspiracy who were selling the drug. The defendant collected proceeds from the sale of the drug. The defendant also traded or otherwise distributed MDPV to other members of the conspiracy. The defendant communicated by cellular telephone and met directly with other members of the conspiracy to coordinate MDPV transactions. On November 10, 2011, law enforcement conducted a bail search at the Blackstone Residence and subsequently executed a search warrant at that location. As a result, law enforcement seized a large quantity of MDPV and other controlled substances, cash, drug records, and drug paraphernalia. The defendant was arrested following the search.

*Gov't's Version of the Offense* at 1-2 (ECF No. 371) (*Prosecution Version*).   Mr. Ketchen's counsel confirmed that he had reviewed the prosecution version, that he was convinced the Government's version of the offense could be proved, and that a properly instructed jury could determine beyond a reasonable doubt that Mr. Ketchen was guilty of each of the crimes to which he pleaded guilty.   *Tr.* 15:10-16-7.   Mr. Ketchen confirmed that he had carefully reviewed the prosecution version, understood it, had no disagreements with it, and that it was true to his own personal knowledge.   *Id.* 16:8-17:10.   Upon final inquiry, the Court accepted Mr. Ketchen's guilty plea under Federal Rule of Criminal Procedure 11.   *Id.* 20:22-21:9.

### C.   The Presentence Investigation

The final Presentence Report (PSR) described Mr. Ketchen's alleged unlawful conduct in relevant part:

> This case was investigated by the United States Department of Justice Drug Enforcement Administration (DEA) and other law enforcement agencies and commenced in early 2011. Authorities learned of a drug trafficking organization, involving 3,4- Methylenedioxypyrovalerone (MDPV), otherwise known as the synthetic drug "bath salts." In general, the defendant was one of the main dealers of MDPV in this conspiracy who was also abusing the drug. The defendant obtained large quantities of MDPV from various sources, including his primary source of supply; Ryan Ellis. Ketchen, with the assistance of others, would process and re-package the large quantities of MDPV and supply distribution size quantities of MDPV to other members of the conspiracy for resale.
>
> In 2011, the DEA obtained information from a source of information, (herein SI-2) regarding the defendant's involvement in the bath salts conspiracy. According to SI-2, he was introduced to Ketchen in June or July of 2011, at 10 Blackstone Street, Bangor, Maine, where Ketchen was residing. Ketchen and co-conspirator Jamie Lewis introduced SI-2 to bath salts and he began obtaining bath salts from the defendant and Lewis on a regular basis. SI-2 began distributing bath salts for Ketchen and Lewis to support his own habit. SI-2 would purchase 10 grams of

bath salts for $800 from Ketchen. Eventually, Ketchen introduced SI-2 to his source of supply, Ryan Ellis, and SI-2 began dealing directly with Ellis. When SI-2 began working for Ellis, he stopped dealing for Ketchen and Ellis paid Ketchen a $3,000 drug debt that SI-2 had "racked up." Although Ellis admitted he sold bath salts anywhere between $0 and $50, the typical resale price in this conspiracy was $100 per gram of bath salts. Therefore, following the rule of lenity, the Probation Office will convert the $3,000 drug debt into drug quantity ($3,000 divided by $100, equals 30 grams of bath salts). SI-2 advised Ketchen also sold Suboxone, Xanax, Klonopin, and Ecstasy. On one occasion, SI-2 went with a co-conspirator to pick up between 500 and 1,000 Xanax from Ketchen. Following the rule of lenity, the Probation Office will hold the defendant accountable for 500 Xanax 1 mg pills; the typical pill weight the defendant sold. SI-2 walked in on a deal between Ketchen and Ellis, where Ketchen gave Ellis approximately $5,000 for a large vacuum sealed bag of bath salts. Although it is likely the defendant purchased the bulk quantity of bath salts for reduced price; following the rule of lenity, the Probation Office will use the aforementioned method for converting cash into drug quantity ($5,000 divided by $100, equals 50 grams of bath salts). SI-2 further advised he witnessed SI-4 purchase 10 to 20 grams of bath salts from Ketchen on more than 50 occasions (10 multiplied by 50, equals 500 grams of bath salts). . . . SI-8 reported Bryden took him to the Blackstone residence and fronted Ketchen one ounce (28.3495 grams) of bath salts. To avoid double counting, the Probation Office did not hold the defendant accountable for the one ounce of bath salts fronted to him. SI-16 reported he would purchase bath salts from the defendant for $30 per gram. SI-16 would purchase 10 grams of bath salts at a time, for an unknown period of time. . . . .

Grand Jury testimony and information obtained from confidential sources, corroborates the following information. Ketchen and Ryan Ellis were on the same level and considered to be the "biggest dealers of bath salts." In fact, Ellis advised he had four "main people," naming Ketchen as one of them. Ketchen resided at the aforementioned residence on Blackstone Street in Bangor, Maine, and sold bath salts out of the residence. Ketchen would receive shipments of bath salts at his residence on behalf of Ellis. The defendant would order prescription pills online and receive the shipments at his residence, as well as other locations. With the assistance of others, Ketchen would process and re-package the large quantities of bath salts and supply distribution size quantities to other members of the conspiracy. The defendant's primary purpose of his residence was to store, package and sell drugs. The defendant sold distribution quantities of bath salts to various customers throughout the State of Maine; primarily out of his residence. Other co-

16

conspirators would make deliveries on behalf of Ketchen. The defendant would front his customers, with the expectation they would pay him back, or he would also take cash or stolen property for payment for bath salts.

On November 3, 2011, co-defendant April Kane was arrested by Veazie Police Department, Veazie, Maine, for Violating Conditions of Bail and Unlawful Trafficking in Bath Salts. A search of the vehicle revealed various unlawful items, including, but not limited to 180.70 grams of bath salts concealed inside of a speaker in the trunk. The bath salts were placed inside of a subwoofer, which was then placed inside Kane's vehicle. SI-1 reported the bath salts Kane was caught with were supplied by Ketchen, but really belonged to Ellis.

On November 4, 2011, Shayne Ellis was arrested by Brewer Police Department for Aggravated Trafficking of Scheduled Drugs; Unlawful Possession of Hydrocodone; and Unlawful Possession of Oxycodone. A search of Shayne Ellis yielded various items. Other than the 32 Suboxone pills and 7 Suboxone strips he possessed, SI-1 indicated the drugs located on Shayne Ellis were obtained from Ketchen. . . . .

On November 10, 2011, law enforcement conducted a bail search at the defendant's residence located on Blackstone Street in Bangor, Maine. A search of Ketchen's person revealed a Crown Royal bag containing $1,335 in cash. A search of the defendant's bedroom revealed cellular telephones; Tupperware containers containing a confirmed total amount of 122.5 grams of bath salts; digital scales; packaging material consistent with bath salts distribution; various drug paraphernalia; notebooks that contained what appeared to be drug records, as well as websites and lists of chemical names; laptop computers; and a safe. Ketchen denied ownership of the safe, or the combination to get into the safe. The safe was subsequently seized to allow agents to apply for a search warrant. On November 15, 2011, the search warrant was authorized for the safe seized from Ketchen's bedroom. Execution of the search warrant revealed various items including, but not limited to: documents and a medical wrist bracelet bearing the name "Alan Ketchen;" a video recorder; an iPod Touch; 7 Oxycodone pills 5 mg (35 mg); 1 Oxycodone pill 15 mg; 7 Clonazepam (Klonopin) pills 0.5 mg; 40 Valium (Diazepam) pills 10 mg; 6 Xanax pills 1 mg; 15 Percocet (Oxycodone) pills 10 mg (150 mg); $10,127 in cash; 988 grams of bath salts. Some of the drugs were contained in bulk in plastic containers, while some had been prepackaged in plastic bags bearing logos identical to bags found in Ketchen's bedroom on November 10, 2011. . . .

17

In February 2012, SI-2 provided the DEA with information regarding the contents of the notebooks seized from the defendant's residence on November 10, 2012, which contained buyer's drug debts. SI-2 identified the names listed next to the dollar amounts, which consisted of owed drug debts. As previously mentioned, Ryan Ellis paid Ketchen for SI-2's $3,000 drug debt balance; therefore, the Probation Office did not consider the debts listed for SI-2, as they have been previously calculated into the drug quantity. . . .

It was later discovered that agents did not recover an additional quantity of bath salts that were located in Ketchen's residence. The defendant called SI-1 from the Penobscot County Jail and advised him of the missed drugs still at his apartment. Co-conspirators Daniel Hines and Gina Nelson agreed to sell the unrecovered drugs. The drugs were then transported to the Riverview Motel in Bangor for a short time, before being transported to a storage unit in Old Town, Maine, rented by Daniel Hines. On November 21, 2011, the remaining unrecovered drugs were transported from the storage unit back to the room at Riverview Motel. On November 22, 2011, the co-conspirators moved the drugs to a local hotel in Brewer, Maine. On November 22, 2011, law enforcement conducted surveillance on the local hotel, as the renter of the hotel room was on bail conditions, including a search condition without probable cause. Law enforcement observed a male, later identified as Ryan Ellis, exit the hotel room under surveillance. Ellis placed a bag in the trunk of a vehicle and drove off. The vehicle operated by Ellis was subsequently stopped by Brewer Police Department. A search of the vehicle revealed, among many other things, 313.1 grams of bath salts in vacuum sealed bags. The bags of bath salts were located in the backpack that Ellis was observed placing in the trunk, prior to leaving the hotel room. Law enforcement subsequently conducted a bail search at the hotel room and located various drug-related items, including 85.4 grams of bath salts; 0.58 ounces of marijuana; $3,469 cash (34.69 grams of bath salts); 197 Xanax; 44 Klonopin (Clonazepam); 7 Suboxone; 6 Methadone; 7 Vicodin (hydrocodone bitartrate and acetaminophen); 17 Oxycodone; and 1 OxyContin (Oxycodone). Subsequent to the arrest, SI-1 reported Ellis arrived at the hotel room in Brewer to pick up the (unrecovered) bath salts. SI-1 indicated Ellis took the drugs, but left some behind at the hotel room; a smaller portion of approximately one ounce as a "gift" and a larger portion to give to a co-conspirator for distribution. . . .

In 2011, the DEA obtained information from SI-3 who indicated he would purchase 1,000 or more Xanax pills and 45-50 Suboxone from Ketchen at one time. SI-1 indicated he purchased the following drugs

18

from Ketchen: approximately 333 Xanax on six or eight occasions (1,998 Xanax); 20 to 30 Oxycodone 5 mg pills; and 20 to 40 Klonopin pills. SI-1 reported he had seen Ketchen with as many as 1000 Xanax pills at one time. SI-34 advised that Ketchen was one of his main suppliers. . . .

In 2013, SI-11 informed the DEA that from May to November of 2011, he was getting one ounce of bath salts one-to-two times per week. . . . SI-14 reported that every time he was at Ketchen's residence, he saw a huge "pile" of bath salts, estimated to be approximately 40 grams. On four occasions, SI-14 witnessed Ellis drop a "brick" of bath salts off at the defendant's residence. Each brick was reported to be 12 inches in length. . . .

*PSR* ¶¶ 4-13.[1]  Mr. Ketchen also offered a written acknowledgment of his guilt and

an apology for his actions for which he pleaded guilty:

My name is Alan Ketchen and I am 41 years old. I have a lengthy drug history. I have been able to work through it in the past and still function for quite some time but not without consequence. With regard to the instant criminal offense, I am so sorry for the harm I have done to myself, my girlfriend Gina Nelson, my baby, my family, the community, other drug addicted people involved, public safety and the court. Back in December 2010 I was turned onto a drug called bath salts "MDPV" by a longtime drug addict so called friend Jamie Lewis. It was a rave drug. People do certain drugs to stay up all night and go partying all night, dance, have sex or whatever. Looking back the addiction was horrible. I started using it and increased the use to astronomical proportion. Eventually, in March or April 2011 I was introduced to Jamie Lewis' dealer Ryan Ellis who would sell some to me so that I could use more and sell to other people. I was told that they were synthetic research chemicals that were legal by Jamie and Ryan. This drug was supposed to be so legal that you could get it at the head shop and at the truck stops. That they could get it off the internet. That's what Jamie and Ryan told me. From that point on, I could not seem to stop using the drugs and increased my use and my sale. At some point I became aware that I was selling and using an illegal drug. I was out of control. Ryan would provide me with more and more drugs and more and more money and I would just use more and more. I started selling MDPV out of my apartment and was clear that the laws changed or at least my perception of the law changed. I was not just selling a legal synthetic chemical, I

---

[1]      Mr. Ketchen originally made factual objections to portions of paragraphs 5, 8, 10, 11, and 13 of the PSR but later withdrew those objections. *Gov't's Opp'n* at 4 n.2; *Gov't's Mem. in Aid of Sentencing* at 9 (ECF No. 595).

was selling an illegal drug and using an illegal substance. I was being supplied an illegal drug, selling an illegal drug and getting enough to use in return. That was my reward because I was in the wrong state of mind not thinking of the consequences but being a super drug addict. Instead of making much money from my sales, I was increasing my drug usage and buying paraphernalia. I was sending all or most of the money back to Ryan, day to day it became a real happening for me to use. A real social event every day, but what a false reality. On November 10, 2011, when police came to my house, I was as high as a drug addict could be and had several hundred grams of drugs and several dollars of money to give back to Ryan, my drug dealer. At that time, I was arrested and I stopped using and selling MDPV. Now I have to serve my time in federal prison. I am sorry for those activities and once again apologize to the court. I have been in jail from November 10, 2011 to January 18, 2012. Several months later, August 6, 2013, I was arrested on these federal charges for those acts and admit the violation and place myself on the mercy of the court.

PSR ¶ 18.

> ### D.   The Statutory Backdrop

> #### 1.   Chapter 13 of Title 21; Drug Abuse Prevention and Control

In the indictment, the Government charged Mr. Ketchen with violating 21 U.S.C. § 841(a)(1), which makes illegal the knowing or intentional distribution or possession with the intent to distribute certain controlled substances. More specifically, the Government charged Mr. Ketchen with violating § 841(b)(1)(C), a provision that refers to "controlled substances in schedule I or II." *See* 21 U.S.C. § 841(b)(1)(C). Similarly, in § 802(6), the law defines "controlled substance" to mean "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). The law grants the Attorney General of the United States the authority to add or remove drugs from a schedule after opportunity for a hearing. 21 U.S.C. § 811(a).

Effective October 21, 2011, the Administrator of the Drug Enforcement Administration listed MDPV as a schedule I controlled substance:

> **SUMMARY:** The Administrator of the Drug Enforcement Administration (DEA) is issuing this final order to temporarily schedule three synthetic cathinones under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of 21 U.S.C. 811(h). The substances are 4-methyl-N-methylcathinone (mephedrone), 3,4-methylenedioxy-N-methylcathinone (methylone), and 3,4-methylenedioxypyrovalerone (MDPV). This action is based on a finding by the Administrator that the placement of these synthetic cathinones and their salts, isomers, and salts of isomers into Schedule I of the CSA is necessary to avoid an imminent hazard to the public safety. As a result of this order, the full effect of the CSA and its implementing regulations including criminal, civil and administrative penalties, sanctions and regulatory controls of Schedule I substances will be imposed on the manufacture, distribution, possession, importation, and exportation of these synthetic cathinones.

Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cathinones Into Schedule I, 76 Fed. Reg. 65371-01 (Oct. 11, 2011). The October 11, 2011 DEA order clarified that for purposes of criminal liability, the effective date was October 21, 2011. *Id.*

## 2. The Controlled Substance Analogue Enforcement Act of 1986

Congress enacted the Controlled Substance Analogue Enforcement Act of 1986 (the Analogue Act) "to prevent 'underground chemists' from creating new drugs that have similar effects on the human body as drugs explicitly prohibited under the federal drug laws." *United States v. Ketchen*, 1:13-cr-00133-JAW, 2015 U.S. Dist. LEXIS 75689, at *17 (D. Me. June 11, 2015) (quoting *United States v. McFadden*, 753 F.3d 432, 436 (4th Cir. 2014), *vacated and remanded,* 135 S. Ct. 1039 (2015)); *United States v. Hodge*, 321 F.3d 429, 437 (3d Cir. 2003) (purpose of the Analogue Act is to

"make illegal the production of designer drugs and other chemical variants of listed controlled substances that otherwise would escape the reach of the drug laws"). The Analogue Act provides:

> A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I.

21 U.S.C. § 813. Except as provided in subparagraph (C) of § 802(32),[2] the term "controlled substance analogue" means a substance:

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). These provisions require the Government prove three elements: "(1) substantial chemical similarity between the analogue and the controlled substance (the chemical structure element)"; "(2) substantially similar actual, intended, or represented physiological effects on the central nervous system (the pharmacological similarity element)"; and, "(3) intent that the substance be consumed by humans (the human consumption element)." *Ketchen*, 2015 U.S. Dist.

---

[2]   The exceptions in subparagraph C are not relevant to the issues before the Court. *See* 21 U.S.C. § 802(32)(C).

LEXIS 75689, at *18 (citing 21 U.S.C. § 813; *McFadden*, 753 F.3d at 436; *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003)).

### E. *McFadden* and its Progeny

In *McFadden*, the Supreme Court held that in order to prove an Analogue Act violation the government must establish that the defendant knew he was dealing with a "controlled substance." 135 S. Ct. at 2302. The *McFadden* Court noted that "[t]he Analogue Act requires a controlled substance analogue, if intended for human consumption, to be treated 'as a controlled substance in schedule I' for purposes of federal law." *Id.* at 2303 (quoting 21 U.S.C. § 813). Accordingly, the Supreme Court turned to the mens rea requirement of the CSA, which makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." *Id.* (quoting 21 U.S.C. § 841(a)(1)). Thus, as the Analogue Act requires controlled substance analogues to be treated as controlled substances, the Supreme Court concluded that pursuant to § 841, "the Government must prove that a defendant knew that the substance with which he was dealing was 'a controlled substance,' even in prosecutions involving an analogue." *Id.* at 2305.

As for the knowledge requirement, the *McFadden* Court clarified that under § 841 a defendant need know "only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *Id.* at 2304. The Supreme Court held that this can be established in two ways. First, knowledge "can be established by evidence that a defendant knew that the substance with which he

was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance." *Id.* at 2305. Second, knowledge can be established "by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." *Id.* To establish knowledge under this second approach, the government must show that the defendant knew that the substance: (1) has a chemical structure "substantially similar to the chemical structure of a controlled substance in schedule I or II"; (2) has a "'stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than' the effect of a controlled substance in schedule I or II"; and (3) that the defendant "represented or intended the substance to have that effect with respect to a particular person." *Id.* (quoting § 802(32)(A)); *see also* Section III(D)(2), *supra*. The Supreme Court underscored that:

> [a] defendant who possesses a substance with knowledge of those features knows all of the facts that make his conduct illegal, just as a defendant who knows he possesses heroin knows all of the facts that make his conduct illegal. A defendant need not know of the existence of the Analogue Act to know that he was dealing with 'a controlled substance.'

*Id.*

Additionally, the Supreme Court noted that "as with most *mens rea* requirements, the Government can prove the requisite mental state through either direct evidence or circumstantial evidence," and that "[d]irect evidence could include, for example, past arrests that put a defendant on notice of the controlled status of a

substance," while "[c]ircumstantial evidence could include, for example, a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to seizure at customs." *Id.* at 2304 n.1 (citations omitted). The Court clarified that circumstantial evidence can be used to show that a defendant knew that a substance was controlled under the CSA or by operation of the Analogue Act. *Id.* at 2306 n.3.

The First Circuit has yet to address *McFadden* and its mens rea requirements. The Eighth Circuit has done so twice. *See United States v. Carlson*, 810 F.3d 544 (8th Cir. 2016); *United States v. Ramos*, Nos. 15–1592, 15–1602, 2016 WL 497167 (8th Cir. Feb. 23, 2016). In *Carlson*, the Eighth Circuit upheld the district court's jury instructions regarding the second way to establish knowledge under *McFadden* (e.g., by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue). 810 F.3d at 552. Specifically, the district court instructed the jury that if "the government has proved beyond a reasonable doubt that the defendant knew facts that satisfy part 2 of the test . . . [similar nervous system effects], that is evidence from which you may, but are not required to, find or infer that the defendant knew facts that satisfy part 1 of the test . . . [similar chemical structure]." *Id.* at 551. The *Carlson* Court identified this as the "*Turcotte* inference," referring to the Seventh Circuit's decision in *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005), which held that if the "scienter requirement is met with regard to the second part of the analogue definition (knowledge or

25

representation of similar physiological effects), the jury is permitted—but not required—to infer that the defendant also had knowledge of the relevant chemical similarities." *Carlson*, 810 F.3d at 551 (quoting *Turcotte*, 405 F.3d at 527). The Seventh Circuit found that without such a permissive inference, it may be "extremely difficult" and "a significant prosecutorial burden" to prove to a jury that a defendant knew about the chemical structure of a substance.[3] *Id.* The *Carlson* Court concluded that:

> [a]lthough evidence of a defendant's knowledge that a particular substance has a pharmacological effect similar to that produced by a controlled substance is ambiguous proof of scienter by itself, it may be probative of the defendant's knowledge of chemical structure when considered in the context provided by other evidence. . . .   In order, therefore, to instruct a jury properly and consistently with the footnotes in *McFadden*, the trial court may instruct that knowledge of similar pharmacological effect may be considered as circumstantial evidence,

---

[3]    The Seventh Circuit explained:

The question of similar chemical structure is particularly nettlesome since, even if such chemical similarities exist, and even if the defendant is aware of these similarities, the intricacies of chemical science may render it extremely difficult to prove that a defendant had such knowledge. As a provisional remedy for this problem, we prescribe that, in such cases, if the scienter requirement is met with regard to the second part of the analogue definition (knowledge or representation of similar physiological effects), the jury is permitted—but not required—to infer that the defendant also had knowledge of the relevant chemical similarities. This approach is justified since, as a practical matter, defendants who know or represent to others that the substance in question has physiological effects similar to a controlled substance are likely to be aware of basic chemical similarities as well, even if that fact is difficult to prove conclusively.

This approach also dovetails with the commonsense recognition that, in selling or purchasing such substances, all parties to the transaction are primarily interested (perhaps solely interested) in the substance's physiological effects. Yet at the same time, if the defendant truly had no knowledge of the substance's chemical character, or if, under the circumstances, chemical complexities make such knowledge extremely unlikely, an avenue should be left open for defendants to refute such an inference. In any case, our well-established jurisprudence regarding the scienter requirements of controlled substances violations require that juries confront these questions of knowledge squarely.

*Turcotte*, 405 F.3d at 527-28.

26

along with the other evidence, in deciding whether the evidence as a whole proved knowledge of similar chemical structure beyond a reasonable doubt.

*Id.* at 552-53 (citations omitted).  *See also Ramos*, 2016 WL 497167, at *5 (the Government need not present direct evidence of the defendant's knowledge of the analogue's nature and effects, and could instead "satisfy its burden through circumstantial evidence of knowledge") (citing *McFadden*, 135 S. Ct. at 2304 n.1).

Taking a contrary position to the Seventh and Eighth Circuits, the Tenth Circuit rejected the "*Turcotte* inference" and its application to *McFadden*.[4]  *United States v. Makkar*, 810 F.3d 1139, 1144-45 (10th Cir. 2015).

## IV.   DISCUSSION

### A.   A Hybrid Indictment and Guilty Plea

An unusual aspect of Mr. Ketchen's indictment and guilty pleas is that both Count One and Count Three allege violations of two different statutes: the Controlled Substance Act and the Analogue Act.  *Indictment* at 1-5.  When the DEA issued its final order designating MDPV as a schedule I controlled substance on October 21,

---

[4]
> And the plain language of the statute underscores and confirms what *McFadden* clearly explained. As written, the Analogue Act makes it a crime to possess or distribute a drug that *both* (1) is substantially similar in chemical structure to a schedule I or II CSA controlled substance, *and* (2) has, or is represented or intended to have, an effect on the central nervous system that is substantially similar to that of a schedule I or II CSA controlled substance.  Both elements are essential to a conviction and the government offers no sensible way or reason why a mens rea requirement applied to the statute might take an olympian leap over the first essential element and touch down only on the second. Neither can we discern for ourselves any plausible argument along these lines.

*Makkar*, 810 F.3d at 1146 (emphasis in original).

27

2011, conduct that violated the Analogue Act transmogrified into a Controlled Substances Act violation.

Even though Mr. Ketchen now argues that the Supreme Court's *McFadden* decision casts a pall over his entire guilty plea, during his Rule 11 hearing, Mr. Ketchen expressly admitted violating the Controlled Substances Act as well as the Analogue Act; significantly, the *McFadden* decision deals only with the Analogue Act, not the Controlled Substances Act.  *See United States v. Tuttle*, No. 15-158-cr, 2016 U. S. App. LEXIS 7189, *4 (2d Cir. Apr. 21, 2016) (*McFadden* is "inapposite" to a Controlled Substances Act violation).

Furthermore, unlike the standards in *McFadden* for Analogue Act cases, for Controlled Substance Act cases, the Government "need *not* have proved beyond a reasonable doubt . . . that [the defendants] knew or were willfully blind to the fact that the controlled substance was [a particular controlled substance] specifically." *United States v. Valbrun*, 2:14-cr-00069-JDL-9, 2016 U.S. Dist. LEXIS 6871, *3 (D. Me. Jan. 15, 2016) (quoting *United States v. Perez-Melendez*, 599 F.3d 31, 41 (1st Cir. 2010)) (emphasis in original).  Under the Controlled Substances Act, the Government need only prove beyond a reasonable doubt that the defendant knew he was in possession of a controlled substance, not a specific controlled substance.  *McFadden*, 135 S. Ct. at 2304 ("The ordinary meaning of § 841(a)(1) thus requires a defendant to know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules"); *Perez-Melendez*, 599 F.3d at 41.  Applying these principles to Government's Version of the Offense in this case, the facts Mr. Ketchen

admitted were true at the Rule 11 are sufficient under the Controlled Substances Act to establish a violation of those parts of Counts One and Three that allege Controlled Substances Act violations.

This leaves Mr. Ketchen is an unusual position. He has not begun to state a colorable claim that he is not guilty of violating those portions of Counts One and Three that allege he violated the Controlled Substances Act. Accordingly, for that reason alone, his attempt to withdraw his guilty pleas to both counts in their entirety is without even a plausible foundation. His sole conceivable argument relates to the period of time before October 21, 2011, when the Analogue Act applied.

But once his criminal responsibility under the Controlled Substances Act is established, how to treat his pre-October 21, 2011 activity becomes solely a sentencing issue. Whether or not his possession of MDPV before October 21, 2011 should be deemed part of his drug quantity for the offense of conviction under United States Sentencing Guideline (U.S.S.G.) § 2D1.1(a)(5) – part of his drug quantity for relevant conduct under U.S.S.G. § 1B1.3 – is a sentencing issue. However this issue might be resolved at sentencing, it does not justify his motion to withdraw his guilty pleas in their entirety.

Despite the fundamental flaw in his motion to withdraw his guilty plea, the Court has analyzed his contentions under the traditional analytic pathway and in doing so, the Court has concluded that the result is the same.

### B.     Withdrawal of a Guilty Plea

"It is common ground that a defendant has no absolute right to withdraw a guilty plea." *United States v. Caramadre,* 807 F.3d 359, 366 (1st Cir. 2015). "When a defendant moves to withdraw a guilty plea after the court has accepted it but before the court has sentenced him, he may do so only if he 'can show a fair and just reason for requesting the withdrawal.'" *Id.* (quoting Fed. R. Crim. P. 11(d)(2)(B)); *United States v. Gates*, 709 F.3d 58, 69 (1st Cir. 2013). "The burden rests with the defendant to make this showing." *Caramadre,* 807 F.3d at 366; *United States v. Marrero–Rivera,* 124 F.3d 342, 347 (1st Cir. 1997).

In determining whether a defendant carries his burden, "an inquiring court must consider the totality of the circumstances." *United State v. Merritt*, 755 F.3d 6, 9 (1st Cir. 2014).

> This inquiry often gives particular weight to four factors.  A typical starting point is to ascertain whether the plea was voluntary, intelligent, and informed when tendered. . . .  From that starting point, the inquiry customarily should expand to factors such as the strength of the reasons proffered by the defendant as a basis for withdrawing his plea, the timing of the motion, and the force of any assertion of legal innocence.

*Id.* (internal citations and punctuation omitted).  "If the court concludes that the balance of all the relevant factors tilts in favor of the defendant, then—and only then—should the court proceed to factor in the prejudice (if any) that the government would suffer were the court to allow the motion to withdraw." *Id.*  Furthermore, the Supreme Court explained:

> [w]ere withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the

> guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim.  In fact, however, a guilty plea is no such trifle, but a 'grave and solemn act,' which is 'accepted only with care and discernment.'

*United States v. Hyde*, 520 U.S. 670, 677 (1997) (internal citations omitted).

### 1.    Knowing, Intelligent, and Voluntary

"Critical to the plea-withdrawal inquiry is whether the original guilty plea was knowing, intelligent, and voluntary."  *Caramadre*, 807 F.3d at 366.  "To make this assessment, courts review the Rule 11 hearing to determine whether the 'court adequately observed the formalities imposed by Rule 11, which are intended to assure that the defendant understands the charge and the consequences of the plea.'"  *United States v. Forest*, No.CR-08-155-B-W, 2010 WL 2399554, at *5 (D. Me. June 11, 2010) (quoting *United States v. Padilla-Galarza*, 351 F.3d 594, 597 (1st Cir. 2003)).  Rule 11(b) sets forth the district court's obligation to advise and question the defendant.  FED. R. CRIM. P. 11(b).  "Strict compliance with Rule 11 is 'quite often dispositive in determining whether a defendant has knowingly and voluntarily entered a guilty plea.'"  *Forest*, 2010 WL 2399554, at *5 (quoting *United States v. Austin*, 948 F.2d 783, 787 (1st Cir. 1991)).

Mr. Ketchen's motion to withdraw guilty plea centers on whether his plea was made "knowingly."  Citing the Ninth Circuit's decision in *Bigman*, 906 F.2d at 394, he argues "[d]ue process requires that a defendant be apprised of the nature of the charges, including the element of intent," *Def.'s Reply* at 5, and asserts that under the mens rea requirements set forth in *McFadden* that the Government failed to show in its indictment – and the Court failed to address in the Rule 11 proceeding – that

Mr. Ketchen knew that MDPV was a controlled substance analogue prior to October 21, 2011. *Id.*

### a. The Controlled Substance Act Portion of Counts One and Three

As the Court has pointed out, Mr. Ketchen's argument does not address his guilty pleas to the charges in the Controlled Substances Act portion of Counts One and Three because there is no requirement under the Controlled Substances Act that the Government prove that Mr. Ketchen actually knew that the substance he possessed for distribution was MDPV, only that he knew it was a controlled substance.

Regarding the Controlled Substances Act part of Counts One and Three, the indictment charged in Count One:

> Beginning on a date unknown, but no later than April 1, 2011 and continuing until a date unknown, but no earlier than December 31, 2011, in the District of Maine and elsewhere, defendants . . . *knowingly and intentionally* conspired with one another and with persons known and unknown to commit offenses against the United States, namely distribution and possession with intent to distribute . . . (2) from October 21, 2011 until a date unknown, but no earlier than December 31, 2011, a mixture or substance containing a detectable amount of MDPV, *a Schedule I controlled substance* (by Final Order of DEA, 76 Fed. Reg. 65371 . . . .

*Indictment* at 2-3 (emphasis added). Similar language appears in Count Three. *Id.* at 4-5.

During the Rule 11 proceeding, the Court read Counts One and Three of the Indictment to Mr. Ketchen and he confirmed that he understood them. *Tr.* 9:1-25. The Rule 11 colloquy also complied with all requirements of the Rule. *See* FED. R.

CRIM. P. 11(b)(1)-(3).  In short, Mr. Ketchen has no claim that he did not knowingly, intelligently and voluntarily enter a plea of guilty to the portions of Counts One and Three that alleged violations of the Controlled Substances Act.

### b.   The Analogue Act Portions of Counts One and Three

Regarding the Analogue Act portions of Counts One and Three, Mr. Ketchen's singular complaint about the Rule 11 proceeding is that the Court failed to anticipate the Supreme Court's *McFadden* decision by asking him not only whether he knowingly and intentionally conspired to distribute MDPV, but also whether he knew that the substance with which he had been dealing was in fact a controlled substance. In other words, although Mr. Ketchen concedes that the Court asked him whether he knowingly and intentionally conspired to distribute MDPV, he complains that the Court did not ask him whether he knew that MDPV was a controlled substance. *Def.'s Mot.* at 3 ("[T]here was no inquiry as to whether the government was required to establish beyond a reasonable doubt that the defendant <u>knew</u> he was dealing with a substance before October 21, 2011 regulated by the Analogue Act").

First, Mr. Ketchen is factually incorrect.  The *McFadden* Court explained that the "Government must prove that a defendant knew that the substance with which he was dealing was 'a controlled substance,' even in prosecutions involving an analogue." *McFadden*, 135 S. Ct. at 2305.  At his Rule 11 proceeding, the Court expressly asked Mr. Ketchen that very question.  Mr. Ketchen represented to the Court that he was pleading guilty to Counts One and Three because he was actually

guilty of those crimes and for no other reason. *Tr.* 7:24-8:5. The Court read Counts

One and Three:

> Count 1 alleges that beginning on a date unknown, but no later than
> April 1, 2011, and continuing until a date unknown, but no earlier than
> December 31, 2011, in the District of Maine, which means the state of
> Maine, you and a number of other individuals *knowingly and
> intentionally conspired* with one another *to commit an offense* against
> the United States, *namely, the distribution of MDPV, a controlled
> substance.* . . .

> Now, Count 3 of the indictment alleges that beginning on a date
> unknown, but no later than April 1, 2011, and continuing until
> December 31, 2011, in the District of Maine, which, again, means the
> state of Maine, you *knowingly* leased, rented, *used,* and maintained,
> permanently or temporarily, *a residence* located at 10 Blackstone Street,
> Bangor, Maine, for the purpose of unlawfully distributing and using the
> premises *to distribute MDPV, again, a controlled substance*, in violation
> of federal criminal law.

*Tr.* 9:1-25 (emphasis added). Asked whether he understood the charges in Counts

One and Three, Mr. Ketchen responded that he did. *Id.* Thus the Court directly

asked Mr. Ketchen whether he understood that the indictment was alleging that the

drug he was distributing, MDPV, was "a controlled substance." He confirmed that he

understood. This is precisely what *McFadden* requires. *McFadden*, 135 S. Ct. at

2305 ("[T]he Government must prove that a defendant knew that the substance with

which he was dealing was 'a controlled substance'").

Any possible confusion would have been cleared up by the Government's

Version of the Offense in this case. *Prosecution Version* at 1-3. The Government's

Version expressly states that "[b]etween approximately April 1, 2011 and December

31, 2011, in Penobscot County, Maine and elsewhere, there existed a conspiracy to

possess with intent to distribute and distribute (1) prior to October 21, 2011, a

34

mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802(32) . . . ." *Id.* at 1. The Government's Version states that "[d]uring its existence, the defendant knowingly and intentionally joined and participated in the conspiracy." *Id.*

As the *McFadden* opinion notes, subsection 32 of section 2 of title 21 defines "a controlled substance analogue by its features," including its chemical structure and its effect on the central nervous system, and "[a] defendant who possesses a substance with knowledge of those features knows all of the facts that make his conduct illegal." *McFadden*, 135 S. Ct. at 2305. The *McFadden* Court wrote that "[a] defendant need not know of the existence of the Analogue Act to know that he was dealing with 'a controlled substance.'" *Id.*

It is true that the Government's Version in this case does not spell out the exact features of MDPV that correspond to the statutory requirements of subsection 32. But Mr. Ketchen was represented by counsel and the Court expressly asked Mr. Ketchen whether he had had enough time to discuss the charges with his attorney and whether his attorney had "explained to you the elements and the nature of the offenses charged." *Tr.* 8:16-18. Mr. Ketchen confirmed that he had had enough time to consult with his lawyer and that his lawyer had explained the elements and nature of the offenses charged. *Id.*

Specifically regarding the Government's Version, the Court closely questioned both Mr. Ketchen and his counsel. Mr. Ketchen's attorney confirmed that he was satisfied that "the government's version of the offense can be proved," *id.* 15:10-20,

and that the "admissible part of that evidence would permit a properly instructed jury to determine beyond a reasonable doubt that [his] client is guilty of the crimes to which he is pleading guilty." *Id.* 15:3-7. Mr. Ketchen also confirmed that he understood the Government's Version was an important document, that he had carefully read it, and, after being warned by the Court that he had to tell the truth, Mr. Ketchen confirmed that the contents of the Government's Version were true and that he did not disagree in any way with the Government's Version of the offense. *Id.* 16:8-17:10.

Mr. Ketchen must be held to what he represented to the Court at the time of the Rule 11 hearing. *United States v. Dunfee*, No. 15-1031, 2016 U.S. App. LEXIS 7948, *12 (1st Cir. May 2, 2016); *United States v. Gates*, 709 F.3d 58, 69 (1st Cir. 2013) ("A defendant is normally bound by the representations that he himself makes in open court at the time of his plea"); *United States v. Padilla-Galarza*, 351 F.3d 594, 598 (1st Cir. 2003). Mr. Ketchen takes nothing from the fact that the Government's Version used a statutory reference, thereby incorporating the more elaborate statutory definition. If he had questions about the meaning of the statutory reference, this is why he had a lawyer, and if he was at all confused, he had a right to clarify matters

Moreover, the contents of the PSR in this case corroborate his guilt not only of the Controlled Substances Act portions of Counts One and Three, but also the Analogue Act portions of those Counts. In his own words set forth in the PSR, Mr. Ketchen admitted he was "turned onto a drug called bath salts 'MDPV' by a longtime

drug addict," that the addict told him MDPV was a "rave drug," and that people "stay up all night and go partying all night, dance, have sex or whatever." *PSR* ¶ 18.  Mr. Ketchen admitted his addiction to MDPV was "horrible" and he "started using it and increased the use to astronomical proportion."  *Id.*  Although Mr. Ketchen wrote that he initially thought the drug was legal, he acknowledged that "[a]t some point I became aware that I was selling and using an illegal drug."  *Id.*  He admitted selling MDPV "out of my apartment and was clear that the laws changed or at least my perception of the law changed.  I was not just selling a legal synthetic chemical, I was selling an illegal drug and using an illegal substance.  I was being supplied an illegal drug, selling an illegal drug, and getting enough to use in return."  *Id.*

Although Mr. Ketchen does not clarify exactly when it became clear to him that he was selling an illegal drug, his statement links his knowledge that MDPV was illegal with his selling MDPV out of his apartment and the PSR establishes that he was selling MDPV out of his Blackstone Street apartment as early as June or July 2011, *id.* ¶ 5, if not earlier.  *Id.* ¶ 13 (May to November).  Furthermore, the PSR confirms that one of the sources of information began buying MDPV from Mr. Ketchen at his residence from May 2011 to November 2011.  *Id.* ¶ 13.  In addition, Mr. Ketchen was selling a gram of MDPV for $80 per gram.  *Id.* ¶ 5.

When law enforcement searched his residence on November 10, 2011, they found significant quantities of cash, large quantities of MDPV, digital scales, packaging material, various drug paraphernalia, notebooks with drug records and debts, websites and lists of chemical names, and a safe that contained cash, a variety

of scheduled drugs, and more MDPV. *Id.* ¶ 9. In other words, by November 10, 2011, Mr. Ketchen was engaged in a large-scale MDPV operation, one that likely had existed before October 21, 2011. In fact, the PSR recommends to the Court that Mr. Ketchen be held accountable for dealing MDPV beginning as early as May 2011. *Id.* ¶ 13.

These combined facts circumstantially demonstrate that Mr. Ketchen knew the drugs he was dealing were illegal well before October 21, 2011. *McFadden*, 135 S. Ct. at 2304 n.1. During his period of dealing, Mr. Ketchen became aware of the highly addictive nature of MDPV from his own "horrible" experience; he was selling a gram of the drug at $80, hardly the price one would pay for a legal substance available at "a head shop or truck stop," *PSR* ¶ 18; he had regular direct customers, *id.* ¶ 13; and he also fronted other drug dealers and received cash or stolen property in return. *Id.* ¶ 6. In short, the PSR's recitation of the details of his offense speak against his sudden discovery after October 21, 2011 that the MDPV he was dealing was illegal.

Furthermore, Mr. Ketchen is "foraging in an empty cupboard"; Rule 11 does not require a district court either to spout a fixed catechism or to use a set of magic words." *Jones*, 778 F.3d at 382 (internal citation omitted). "Nor does the rule demand explanations of the 'technical intricacies of the charges in the indictment'" and "it need not be precise to the point of pedantry." *Id.* A Rule 11 colloquy "must be assessed in light of 'the attributes of the particular defendant, the nature of the specific offense, and the complexity of the attendant circumstances.'" *Id.* (internal

citation omitted).  Mr. Ketchen's nuanced argument asks more of Rule 11 than is required and seeks the Court to instead delve into the "technical intricacies of the charges in the indictment."  The indictment and the Rule 11 hearing adequately appraised Mr. Ketchen of the intent requirements of the charges.

What's more, the Court strictly complied with the Rule 11 formalities at Mr. Ketchen's May 7, 2014 hearing.  Specifically, the Court, inter alia, found Mr. Ketchen to be competent, confirmed that he plead guilty because he was actually guilty and did so voluntarily, reviewed the nature of the charges and their consequences with Mr. Ketchen and ensured that he understood them, established the accuracy of the prosecution version and that there was a factual basis for the guilty plea, advised him of the rights he was waiving, and confirmed with his counsel that a properly instructed jury could determine beyond a reasonable doubt that Mr. Ketchen was guilty of each of the crimes to which he plead guilty.  *See* Section III(B), *supra*; *see also Forest*, 2010 WL 2399554, at *5; *United States v. Sahlin*, 399 F.3d 27, 32–33 (1st Cir. 2005); *United States v. Santiago*, 229 F.3d 313, 317 (1st Cir. 2000).

*McFadden* also held that knowledge can be established "by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue."  *McFadden*, 135 S. Ct. at 2305.  To do so the Government must show that the defendant knew that the substance: (1) has a chemical structure "substantially similar to the chemical structure of a controlled substance in schedule I or II" (chemical structure element); (2) has a "'stimulant, depressant, or hallucinogenic effect on the central nervous system that is

substantially similar to or greater than' the effect of a controlled substance in schedule I or II" (pharmacological similarity element); and (3) that the defendant "represented or intended the substance to have that effect with respect to a particular person" (human consumption element). *Id.* (quoting § 802(32)(A)); *see also* Section III(D)(2), *supra*.

The human consumption requirement is evident from the record. Additionally, as discussed, there is significant circumstantial evidence that Mr. Ketchen knew MDPV was pharmacologically similar to a controlled substance before October 21, 2011: he was told it was a "rave drug" that people do "to stay up all night and go partying all night, dance, have sex or whatever" and admitted his addiction to MDPV was "horrible"; he frequently bought and sold MDPV with other controlled substances (e.g., Xanax, Valium, Klonopin, Vicodin, Suboxone, Methadone, Oxycodone, Ecstasy); a search of his residence revealed significant quantities of cash, large quantities of MDPV, digital scales, packaging material, various drug paraphernalia, notebooks with drug records and debts, websites and lists of chemical names, and a safe that contained cash, a variety of scheduled drugs, and more MDPV; his phone call to co-conspirators after his arrest advising them of the drugs still in his apartment, which were subsequently moved to a number of surreptitious locations; and his acknowledgement of the harm his selling of MDPV did to the community. *See* Section III(C), *supra*.

The Seventh and Eighth Circuits hold that evidence of pharmacological effect "may be considered as circumstantial evidence, along with the other evidence, in

deciding whether the evidence as a whole proved knowledge of similar chemical structure beyond a reasonable doubt." *Carlson*, 810 F.3d at 553 (citing *McFadden*, 135 S. Ct. at 2305, nn.1-3); *Turcotte*, 405 F.3d at 527-28. The Court adopts the *Carlson* and *Turcotte* Courts' manifest reasoning that it is "extremely difficult" and "a significant prosecutorial burden" to prove to a jury that a defendant knew about the chemical structure of a substance. *Carlson*, 810 F.3d at 551-53; *Turcotte*, 405 F.3d at 527-28. The Court determines that, in considering the evidence provided in the indictment, the Rule 11 proceeding, and the PSC, a properly instructed jury could determine beyond a reasonable doubt that Mr. Ketchen knew he was dealing with a controlled substance analogue before October 21, 2011.

The Court finds that Mr. Ketchen knowingly, intelligently, and voluntarily entered his guilty plea.

## 2.    The Force of Defendant's Reasons for Withdrawing the Guilty Plea

"A defendant may not renounce a guilty plea 'without advancing a plausible reason for so doing.'" *Forest*, 2010 WL 2399554, at *5 (quoting *United States v. Doyle*, 981 F.2d 591, 594 (1st Cir. 1992)). "Plausibility, however, must 'rest on more than the defendant's second thoughts about some fact or point of law, or about the wisdom of his earlier decision.'" *Id.* (quoting *United States v. Parrilla–Tirado*, 22 F.3d 368, 371 (1st Cir. 1994)).

Mr. Ketchen argues two reasons for withdrawal of his guilty plea: (1) that the Court failed to explain the mens rea requirements of Counts One and Three of the indictment as required under *McFadden*, and (2) that the Government cannot prove

beyond a reasonable doubt that prior to October 21, 2011 he knew he was possessing and distributing a controlled substance analogue. *See Def.'s Mem.* at 1-3. The Court has demonstrated the shortcomings of Mr. Ketchen's first argument regarding the mens rea requirements of the indictment. *See* Section IV(B)(1)(b), *supra.* Likewise, the Court has illustrated through its analysis under *Carlson* that sufficient evidence exists to demonstrate that Mr. Ketchen knew he was possessing and distributing a controlled substance analogue before October 21, 2011. *Id.*

The Court concludes that Mr. Ketchen has not presented "a plausible reason" for renouncing his earlier guilty plea. *Forest*, 2010 WL 2399554, at *10.

### 3.   The Timing of Mr. Ketchen's Motion

The First Circuit has noted that a "long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses." *Id.* (quoting *Doyle*, 981 F.2d at 595). The "longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration." *Id.* (quoting *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 23 (1st Cir. 1994)).

The First Circuit has explained, however, that the "relevant temporal gap" is the time between the defendant's "discovery of the new information and the filing of his motion." *Id.* (quoting *Gonzalez*, 202 F.3d at 24, *abrogated on other grounds, Padilla v. Kentucky*, 559 U.S. 356 (2010)). The First Circuit has upheld the rejection of plea withdrawal motions in which the relevant gap ranged from eight months, *id.*, to thirteen days. *United States v. Ramos*, 810 F.2d 308, 313 (1st Cir. 1987).

The Government highlights that Mr. Ketchen pleaded guilty to Counts One and Three on May 7, 2014, and on July 30, 2015 – fourteen months after he pleaded guilty – moved to withdraw his guilty plea. *Gov't's Opp'n* at 15. Mr. Ketchen argues that the issuance of *McFadden* constitutes "discovery of the new information" and the "relevant temporal gap" should be twelve days – *McFadden* was decided by the Supreme Court on June 18, 2015, and Mr. Ketchen filed his Motion to Withdraw Guilty Plea on June 30, 2015. *See Def.'s Mot.* at 5.

It is true that the Supreme Court decided *McFadden* less than two weeks before Mr. Ketchen filed his motion. However Supreme Court decisions do not arrive unheralded. Even if Mr. Ketchen should not be blamed for missing the issue when it was decided on May 10, 2013 at the district court level, *United States v. McFadden*, 15 F. Supp. 3d 668 (W.D. Va. 2013), or on May 21, 2014 by the Fourth Circuit, *United States v. McFadden*, 753 F.3d 432 (4th Cir. 2014), the Supreme Court announced the issue nationally when it granted certiorari on January 16, 2015. *McFadden v. United States*, 2015 U.S. LEXIS 619 (2015).

In general, nevertheless, the Court sides with Mr. Ketchen on the timeliness of his motion to withdraw because he filed the motion shortly after the Supreme Court issued *McFadden*.

### 4. Assertion of Actual Innocence

The First Circuit has said that courts should "look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence." *Forest*, 2010 WL 2399554, at *11 (quoting *Doyle*, 981 F.2d at 596). On the other hand,

if the defendant does not proclaim his actual innocence, "this factor cuts sharply against allowing appellant's motion to withdraw [his] guilty plea." *Id.* (citing *Parrilla–Tirado*, 22 F.3d at 373); *see Doyle*, 981 F.2d at 596.

Mr. Ketchen asserts that there is evidence of his innocence "regarding this very narrow issue," noting that in his statement of acceptance of responsibility he maintained that he "was told that they were synthetic research chemicals that were legal . . . that you could get it at the head shop and at truck stops. That you could get it off the internet." *Def.'s Mem.* at 7.

The Court is deeply skeptical of Mr. Ketchen's assertion of innocence "regarding this very narrow issue." As the record shows, Mr. Ketchen admitted to the Government's Version of the Offense at his Rule 11 proceeding, the PSR contains numerous pages of evidence of his participation in the MDPV conspiracy, and his statement in the PSR admits "[a]t some point I became aware that I was selling and using an illegal drug. I was out of control. . . . I started selling MDPV out of my apartment and was clear that the laws changed or at least my perception of the law changed. I was not just selling a legal synthetic chemical, I was selling an illegal drug and using an illegal substance." *PSR* ¶ 18. Finally, the Court's analysis found that there is sufficient evidence that Mr. Ketchen was selling a controlled substance analogue before October 21, 2011. Mr. Ketchen's qualified assertion of innocence is unpersuasive and undermines his request to withdraw his guilty plea.

### 5.    Prejudice to the Government

Before allowing a defendant to withdraw his plea the court must also "consider the potential prejudice to the government." *Forest*, 2010 WL 2399554, at \*13 (quoting *United States v. Richardson*, 225 F.3d 46, 51 (1st Cir. 2000)).  However, "[i]f the court concludes that the balance of all the relevant factors tilts in favor of the defendant, then—and only then—should the court proceed to factor in the prejudice (if any) that the government would suffer were the court to allow the motion to withdraw." *Merritt*, 755 F.3d at 9.

The Court does not conclude that the balance of relevant factors tilts in the favor of Mr. Ketchen.  The Court has found that he knowingly, intelligently, and voluntarily entered his guilty plea, he has not presented "a plausible reason" for renouncing his earlier guilty plea, and he has made no true assertion of innocence. The lone factor of the timing of his motion does not rework the totality of circumstances in his favor, and as such, the Court does not need to proceed to factor in any prejudice the Government would suffer.

The Court concludes that Mr. Ketchen has failed to meet his burden to show a "fair and just reason for requesting the withdrawal" under Federal Rule of Criminal Procedure 11(d)(2)(B).

## V.    CONCLUSION

The Court DENIES Mr. Ketchen's Motion to Withdraw Guilty Plea (ECF No. 708).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day July, 2016